# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 05 2016, 9:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT I.A.

Cara Schaefer Wieneke
Special Asst. to the State Public
Defender
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT D.A.

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of D.D.A. and N.A. (Minor Children) | October 5, 2016 |
| and | Court of Appeals Case No. 11A01-1604-JT-877 |
| I.A. (Mother) and D.A. (Father), | Appeal from the Clay Circuit Court |
| *Appellants-Respondents,* | The Honorable Joseph D. Trout, Judge |
| v. | Trial Court Cause Nos. 11C01-1510-JT-190, -191 |
| The Indiana Department of | |



Child Services,

*Appellee-Petitioner.*

**Crone, Judge.**

## Case Summary

I.A. ("Mother") and D.A. ("Father") (collectively "the Parents") each appeal the trial court's order involuntarily terminating their parental relationship with their minor children D.D.A. and N.A. (collectively "the Children"). We affirm.

## Facts and Procedural History

The facts as found by the trial court during the termination of parental rights hearings held on January 12 and February 9, 2016, follow:[1]

1. The child D.D.A was born on December 17, 2011.

2. The child N.A. was born on February 6, 2014.

---

[1] The trial court refers to the parties by their full names. We use "Mother," "Father," and each child's initials where appropriate. At times, the trial court uses "DCS" in reference to the Indiana Department of Child Services. We will do so as well.

3.  Both children's biological mother is Mother.

4.  Both children's biological father is Father.

5.  The [C]hildren were found to be Children in Need of Services [("CHINS")] by the Clay Circuit Court in Cause numbers 11C01-1402-JC-00019 (D.D.A.) & 11C01-1402-JC-00020 (N.A.) on or about April 15, 2014.

6.  A dispositional decree was entered in the afore-mentioned CHINS matters on or about May 20, 2014.

7.  The [C]hildren were removed from their parents' home on February 12, 2014 and CHINS Petitions were filed on February 14, 2014.

8.  The [C]hildren have not been returned to their parents['] care since February 12, 2014.

9.  The conditions of the family's home were deplorable and unfit for human habitation.

10.  There were a dozen animals in the home, and one dead dog.

11.  There was dog feces on the floor of the home.

12.  There were piles of trash in the home, dirty diapers, dirty clothes and general severe unhygienic conditions.

13.  The house itself was in disrepair, including broken windows, holes in the floor and gaps around the door.

14.  There was no running water in the home, and an insufficient heat source.

15.  DCS put services in place to assist [P]arents with home conditions, maintaining cleanliness and parenting skills.

16. Parents made some improvements to the house, but never made sufficient improvements on their own, to make the home sufficiently safe and clean to allow the [C]hildren to return.

17. For a short time, a family member moved into the home and made significant improvements to the home conditions. However, after a short stay, [P]arents evicted said person, and the home conditions returned to deplorable, unlivable condition.

18. These parents have more concerns than just maintaining safe and suitable housing. They both have emotional or mental health concerns. They both have no desire to pursue a suitable income and instead survive on a few hundred dollars a month in SSI. They even have a lack of priority when it comes to how to spend the little money they have and often face dire circumstances in regard to necessary utilities for the home.

19. They developed a deep dislike and anger for one another which has stifled any possibility of them working together to parent these children. The [P]arents split up in early April, 2015 with Father filing for divorce on April 14, 2015. They [sic] court takes notice of Cause Number 11C01-1504-DR-00240 in that I was the presiding judge for that divorce case which was finalized on June 26, 2015. Father was awarded the marital residence in the divorce but abandoned it and both parties moved to different residences with Father moving in with his girlfriend.

20. Prior to and especially after his divorce, Father has been incarcerated on criminal offenses and probation violations and has tested positive for methamphetamine.

21. Mother … moved to a residence on Knight Street then she moved to Vandalia Street, and then approximately January of 2016, moved back to Knight Street. Despite extensive services provided to Mother, she has not been able to obtain a home and keep it clean and stable. In regard to homemaking and parenting skills, the service providers testified that these parents simply do

not retain any training. They may make progress for a short period of time but then go right back to their prior shortcomings in providing a suitable, clean home for children with appropriate emphasis on safety and supervision.

22. Since the split up with Father, Mother has never lived in one place for more than a few months at a time and in each residence she lives in, the conditions eventually become too unfit to allow children to reside in. She has no written lease at her current residence and can be evicted at any time and has been evicted from this same home once before.

23. Mother also has anger control problems that she has never been able to adequately address. DCS put psychological assistance in place for her to help her address her anger, but she has not benefitted from said assistance or substantially reduced her anger-control problem. She has been at times non-compliant in regard to her medications and in fact, sold her Adderall. Mother has been diagnosed with ADHD, major depressive disorder, bi-polar disorder, borderline personality disorder and mild mental handicap.

24. Mother did present evidence at the trial that her home was clean for the snapshots in question, however, the Court is more convinced of the prior facts in that once again, she has never been able to maintain her homemaking skills for very long and ultimately the home becomes unfit to live in.

25. According to the evidence, Father was in jail for a few weeks after April 2014; he was in jail from August to November of 2014; once again he was in jail from August of 2015 and was incarcerated at the time of the trial. These criminal activities which have led to his incarceration has severely hampered his ability to improve his general parenting skills, his homemaking skills, finding employment or suitable income, participating in treatment and services, and fulfilling his obligation as a parent. Although Father, when available, did visit with the [C]hildren,

he missed many visits because of incarceration.

26. Father's relationship after his split with Mother has been a disaster resulting in positive methamphetamine tests, incarceration, and an inability to meet goals for reunification with his children.

27. Both parents have a lack of education, are low functioning, and have an inability to understand and comprehend information and maintain it.

28. In regard to visitations, the visitation supervisor expressed concerns in regard to Mother, in regard to any real evidence to bonding by her with the [C]hildren. While Father was scheduled to be released soon after the termination trial, his history proves he's highly unlikely to remain free for long. He has 11 criminal convictions, including six felony convictions. He has been on probation multiple times and has violated probation multiple times. Further there is no evidence he has seriously addressed his methamphetamine problem.

29. Both parents have failed to benefit from the services DCS put in place and has [sic] not improved their parenting abilities, income producing abilities, or abilities to maintain any safe and stable housing. This Court sees no clear path that these parents will achieve safe, stable housing at any time in the future.

30. The Court Appointed Special Advocate recommends termination of parental rights based on the evidence presented at the trial as well as the evidence in the underlying CHINS matters.

31. The Children's well-being would be seriously and permanently threatened if they were to be returned to their parents whether immediately or at any time in the future.

Mother's App. at 73-76.

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied by either Mother or Father; (2) there is a reasonable probability that the continuation of the parent-child relationship between the Children and both Mother and Father poses a threat to the well-being of the Children; (3) termination of the parent-child relationship between both parents and the Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petitions to terminate parental rights by clear and convincing evidence and therefore terminated Mother's and Father's parental rights. Each parent appeals. Additional facts will be provided as necessary.

## Discussion and Decision

[4] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.,* 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

…

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  DCS must prove "each and every element" by clear and convincing evidence.  *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2.  If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

"We have long had a highly deferential standard of review in cases involving the termination of parental rights."  *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

We neither reweigh evidence nor assess witness credibility.  We consider only the evidence and reasonable inferences favorable to the trial court's judgment.  Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review:  we first determine whether the evidence supports the findings and then determine whether the findings support the

judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[6] Mother and Father filed separate briefs on appeal raising different issues. Father alleges that his due process rights were violated because DCS allegedly failed to give him adequate notice of the reasons for termination. Because he did not raise this due process claim to the trial court, he attempts to avoid waiver of his argument on appeal by asserting that fundamental error occurred. Mother asserts that the evidence does not support the trial court's conclusions that there is a reasonable probability that the conditions that resulted in the Children's removal from and placement outside the home will not be remedied or that continuation of the parent-child relationship between Mother and the Children poses a threat to the Children's well-being. Mother also challenges the trial court's conclusion that termination of her parental rights is in the Children's best interests. We will address these arguments in turn.

## Section 1 – Father has not established that fundamental error occurred.

[7] Father alleges that his due process rights were violated because the termination petitions filed by DCS failed to give him adequate notice of the reasons for termination. Father concedes that he failed to bring this issue to the trial court's

attention at any time prior to or during the termination hearing, so to avoid waiver of his argument on appeal, he maintains that DCS's alleged failure constituted fundamental error. The fundamental error doctrine is a narrow exception to the waiver doctrine and applies to an "error that was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal." *In re G.P.,* 4 N.E.3d 1158, 1167 n.8 (Ind. 2014). For an appellate court to overturn a trial court ruling based on fundamental error, the error must have been "a clearly blatant violation of basic and elementary principles, *and* the harm or potential for harm therefrom must be substantial and appear clearly and prospectively." *S.M. v. Elkhart Cnty. Office of Family & Children,* 706 N.E.2d 596, 600 (Ind. Ct. App. 1999) (citation omitted).

[8] It is well settled that when the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *J.T. v. Marion Cnty. Office of Family & Children.* 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *trans. denied* (2001). "Due process has never been defined, but the phrase embodies a requirement of 'fundamental fairness.' " *In re C.G.,* 954 N.E.2d 910, 917 (Ind. 2011). The U.S. Supreme Court has stated, "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976). "The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3)

the countervailing governmental interest supporting use of the challenged procedure." *C.G.,* 954 N.E.2d at 917. Because both a parent's and the State's countervailing interests are substantial, when faced with a claim of denial of due process in a termination of parental rights, we focus on the second factor, the risk of error created by the State's chosen procedure in the case. *Id.* at 918.

[9] Father asserts that the termination petitions filed by DCS here merely tracked the statutory language of Indiana Code Section 31-35-2-4(b)(2) regarding the requirements for termination of parental rights. He argues that the trial court, sua sponte, should have required DCS to amend the termination petitions to state the specific reasons that DCS was seeking termination of his parental rights. First, Father cites no authority, and we are unaware of any, that requires a termination petition to be drafted with the specificity that Father desires in order to comply with due process. Moreover, we conclude that the risk of error created by DCS's chosen procedure here was slight. Father admits that he was on notice of the reasons for the Children's initial removal from the home and their adjudications as CHINS, and we disagree with his assertion that "the reasons for the [C]hildren's removal were quite different from the reasons for their remaining outside the home" and therefore he was never put on notice of these new reasons for which DCS was seeking termination. Father's Br. at 12.

As we will discuss more fully below, the reasons for the Children's removal and their adjudication as CHINS was due to the Parents' inability to provide a safe and stable home as evidenced by the deplorable conditions of the home.

Although additional underlying issues came to light following the initial removal and CHINS adjudication, the same overriding parenting inadequacies resulted in the Children's continued placement outside the home and the subsequent filing of the termination petition, namely the Parents' lack of parenting skills and their inability to provide a safe and stable environment within which to raise the Children. Father was properly on notice of the reasons for the Children's removal *and* their continued placement outside the home, and it is evident that he was given the opportunity to be heard on these issues at the termination hearing. Therefore, he has not established that the lack of specificity of the termination petitions filed by DCS created a risk of error or that the harm or potential for harm was substantial. In other words, Father has demonstrated neither a due process violation, nor that fundamental error occurred.[2]

## Section 2 – The evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied.

[10] Mother asserts that the evidence does not support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal from and continued placement outside the home will not be

---

[2] While Father briefly states that he has "made considerable progress" since the Children's removal from the home and that his current incarceration alone "is not sufficient to support termination of [parental rights]," Father's Br. at 13, he makes no claim that DCS failed to present clear and convincing evidence on any statutory element or that the trial court's judgment terminating his parental rights is clearly erroneous. Therefore, we do not address the evidence supporting the termination of Father's parental rights.

remedied. In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[11] The Children were initially removed from Mother's care due to the deplorable conditions of the home. The home was filled with piles of trash, dozens of animals, and the carcass of a dog, and the home was littered with dirty diapers, dirty clothes, and dog feces. The home was in terrible disrepair with broken

windows, holes in the floors, gaps around doors, no running water, and an insufficient heat source. Following the initial removal of the Children, DCS became aware of Mother's anger management issues as well as her complex mental health and low cognitive functioning issues. Mother has been diagnosed with ADHD, major depressive disorder, and bipolar disorder. The record shows that since removal, Mother has been inconsistent with taking prescribed medications to address her mental health issues, and has even sold her medications. During the pendency of this matter, Mother visited inconsistently with the Children and often displayed agitation and inappropriate parenting during visits. Service providers also noted that Mother has demonstrated and continues to demonstrate a lack of bonding with the Children.

[12] The biggest issue that service providers attempted to address was Mother's inability to appropriately care for herself and for the Children. Mother has shown a lack of significant progress in this area, as the overwhelming consensus of service providers is that Mother is seemingly unwilling or unable to retain and implement newly learned hygiene, homemaking, and parenting skills. Based upon this evidence, the trial court concluded that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied.

[13] Mother ignores the lion's share of the evidence and focuses solely on her housing at the time of the termination hearing, maintaining that she had obtained housing that was safe and stable. Specifically, Mother argues that she

presented evidence to the trial court to show that the home that she resided in at the time of the termination hearing was clean and suitable for the Children. Mother's argument misses the mark.

[14] The record indicates that during the two years after the Children were removed from her care, Mother changed residences numerous times, essentially from one unfit home to another. Service providers testified that while Mother would improve her living conditions for very brief periods of time with the help of others, due to her complete lack of homemaking skills, deplorable conditions would quickly return. Her claimed "safe and suitable" housing arrangement at the time of termination had been in place for a mere few weeks, and she admittedly had been evicted from that same residence once before. The trial court determined that Mother's habitual pattern of conduct regarding her inability to provide safety and stability for the Children was far more indicative of her future behavior than her recent minimal progress. This was the trial court's prerogative, and we will not second-guess that determination. We conclude that the evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from the home and continued placement outside of Mother's care will not be remedied.[3]

---

[3] Mother also contends that the evidence does not support the trial court's conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, we need not address that argument. Indiana Code Section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of subpart (b)(2)(B) has been established by clear and convincing evidence.

# Section 3 – The evidence supports the trial court's conclusion that termination of Mother's parental rights was in the Children's best interests.

Finally, we address Mother's assertion that the evidence does not support the trial court's conclusion that termination of her parental rights was in the Children's best interests. In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.,* 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In doing so, the trial court must subordinate the interests of the parent to those of the child." *Id.* Children have a paramount need for permanency, which our supreme court has deemed a central consideration in determining a child's best interests. *E.M.,* 4 N.E.3d at 647-48. As noted earlier, courts need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *Id.* The recommendations of the case manager and the court-appointed special advocate, in addition to evidence that there is a reasonable probability of non-remedied conditions, is sufficient to show by clear and convincing evidence that termination of parental rights is in the child's best interests. *J.S.*, 906 N.E.2d at 236.

---

*A.D.S. v. Ind. Dep't of Child Servs.,* 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Therefore, as we have already determined that sufficient evidence supports the conclusion that the conditions that resulted in the removal of the Children will not be remedied, we need not address any argument as to whether sufficient evidence supports the conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the Children.

[16] Here, Court-Appointed Special Advocate Shannon Wilmore opined that termination of Mother's parental rights was in the Children's best interests based upon the evidence underlying the CHINS adjudications as well as the evidence presented at the termination hearing. She noted that although Mother had made some progress to improve her ability to provide a safe and stable home for the Children, such progress was very minimal. Wilmore described Mother's progress as "couple steps forward, few steps back." Tr. at 299. She observed that Mother appeared to be unable to retain or implement parenting skills that she had been taught. Wilmore stated that, based upon the evidence, she did not believe that Mother "could ever safely parent" the Children. *Id*. Wilmore also noted Mother's anger issues and refusal to consistently take her needed medications. Wilmore emphasized the substantial amount of time that the Children had been in foster care while waiting for Mother to demonstrate an ability to safely and adequately provide for them, but that Mother had failed to demonstrate that ability, and the Children's need for stability at this point was paramount.

[17] Similarly, Family Case Manager Diana Thompson opined that termination of Mother's parental rights was in the Children's best interests. She described Mother's continued unsafe and unstable housing situation as well as Mother's significant problems with anger management and with accepting services. At the time of the termination hearing, Thompson believed that Mother had not made sufficient improvements in her ability to safely parent the Children and

that Mother's lack of significant progress was due to Mother's belief that there was nothing "we could teach her that she felt was of value." Tr. at 72.

[18] Mother does not challenge the evidence supporting these opinions, but claims instead that DCS did not offer evidence to show that the Children had been harmed by their relationship with Mother, or how the Children's circumstances had greatly improved since their removal from Mother's care. Although she concedes that the record indicates that the Children have been doing quite well in foster care, she maintains that DCS "failed to show that the [C]hildren would not be doing just as well developmentally if they had remained in [her] care." Mother's Br. at 21.

[19] We remind Mother that the trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Moreover, DCS is under no obligation to prove, and the trial court is under no obligation to conclude, that the Children would not be doing well developmentally had they remained in Mother's care. Rather, as stated above, the trial court considers the totality of the evidence to determine if it is no longer in the child's best interests to maintain the parent-child relationship. Here, there is ample evidence in the record, when considered in its totality, which supports the trial court's

conclusion that termination of Mother's parental rights in in the best interests of the Children.[4]

[20] In sum, we will reverse a termination of parental rights only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. *C.A.*, 15 N.E.3d at 92-93. Based on the record before us, we cannot say that the trial court's termination of both Mother's and Father's parental rights to the Children was clearly erroneous. We therefore affirm the trial court's judgment.

[21] Affirmed.

Kirsch, J., and May, J., concur.

---

[4] Mother challenges the trial court's finding number 18, in which the court noted that Mother lives off SSI and has "no desire to pursue a *suitable* income" with which to support the children. Mother's Br. at 15-16. Mother argues that the parental participation order required her to secure and maintain a legal and stable source of income which could include public assistance. *See* State's Ex. 8. She asserts that the trial court appears to be punishing her for being legally disabled and unable to work. However, our review of the challenged finding reveals that the trial court was taking issue with Mother's "lack of priority when it comes to how to spend the little money" she has, rather than her unemployment status and receipt of SSI. Mother's App. at 31. Further, even assuming that the trial court's finding is erroneous, any such error was harmless and does not call into question the trial court's ultimate conclusion that termination of Mother's parental rights was in the Children's best interests. *See Matter of A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming termination of parental rights despite erroneous findings because error was "not of such magnitude that it calls into question the court's conclusion" that termination was in child's best interests).